U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described**.

**Signed November 13, 2007**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| TERAFORCE TECHNOLOGY | § | CASE NO. 05-38756-BJH-11 |
| CORPORATION, *et al.* | § | |
| | § | **(Jointly Administered)** |
| Debtors. | § | |

| | | |
|---|---|---|
| | § | |
| TERAFORCE TECHNOLOGY | § | |
| CORPORATION, and DNA COMPUTING | § | |
| SOLUTIONS, INC., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | ADVERSARY NO. 06-03206-BJH |
| | § | |
| VISTA CONTROLS, INC., and | § | |
| CURTISS-WRIGHT CONTROLS, INC., | § | |
| | § | |
| Defendants. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is a Motion for Judgment on the Pleadings (the "Motion") brought by defendants Vista Controls, Inc. and Curtiss-Wright Controls, Inc. The Court has jurisdiction to decide the Motion pursuant to 28 U.S.C. §§ 1334 and 157.

To decide the Motion, the Court must answer the following questions under North Carolina law: (i) can a "non-outsider" to a contract, as defined by the North Carolina Supreme Court, be held liable in tort for interfering with that contract; and, if so, (ii) can a "non-outsider" who uses improper means when interfering with a contract be held liable for tortious interference even though that person had a legitimate business interest in the contract? For the reasons explained more fully below, the Court answers both questions in the affirmative and denies the Motion.

## I.    Factual Background

The plaintiffs in this adversary proceeding are Teraforce Technology Corporation ("Teraforce") and DNA Computing Solutions, Inc. ("DNA," with Teraforce, the "Plaintiff").[1] DNA is a wholly owned subsidiary of Teraforce.[2] Plaintiff's First Amended Complaint and Objections to Claim, Docket No. 49, (the "Amended Complaint") at ¶ 10. The defendants are Vista Controls, Inc. ("Vista") and Curtiss-Wright Controls, Inc. ("Curtiss-Wright," with Vista, the "Defendants"). Vista is a wholly owned subsidiary of Curtiss-Wright. Defendants' Memorandum in Support of Motion for Judgment on the Pleadings, Docket No. 33, (the "Memorandum") at p. 2.

---

[1]The Court will refer to Teraforce and DNA collectively as the "Plaintiff" in keeping with the Plaintiff's own practice. *See, e.g.*, Plaintiff's Original Complaint and Objections to Claim (the "Original Complaint"), Docket No. 1.

[2]Although DNA and Teraforce filed separate bankruptcy cases, the Court granted joint administration of those cases. *See* Order Granting Joint Administration, Docket No. 34 in Case No. 05-38756-BJH-11 (the "Underlying Case").

In deciding the Motion, the Court must accept the Plaintiff's factual allegations as true.[3] Accordingly, all of the "facts" set forth below are taken from the allegations contained in the Amended Complaint.

Before it filed bankruptcy, DNA designed, developed, produced, and sold high-density, high-capacity embedded computing platforms and systems. Amended Complaint at ¶ 13. DNA specialized in digital signal processing ("DSP") applications for radar, sonar, software radio, electronic warfare, and signal intelligence (the "DNA Technology") *Id.* at ¶ 14. The DNA Technology was geared toward benign environments – *i.e.*, it could not withstand extreme temperatures or stresses. *Id.* Vista was in the business of "ruggedizing" circuit boards to withstand various adverse conditions. *Id.* at ¶ 15. In 2003, Curtiss-Wright and DNA discussed the possibility of using Vista's methods to ruggedize DNA's technology. *Id.* at ¶ 21. The resulting circuit card assemblies would be able to withstand adverse conditions and would be suitable for use in military and aerospace contexts. *Id.* at ¶ 18. As a result of their discussions, DNA and Curtiss-Wright executed a memorandum of understanding. *Id.* at ¶ 21. Pursuant to that memorandum of understanding, DNA and Vista executed a Technology License and Marketing Agreement (the "Licensing Agreement"), a Distribution Agreement (the "Distribution Agreement"), and a Technology Transfer and Support Agreement (the "Support Agreement") (collectively, the "Agreements" or the "Vista Agreements"). *Id.*

Under the Licensing Agreement, DNA granted a license to use the DNA Technology to Vista and Vista promised to use that technology to develop several finalized products (the "Combined

---

[3]For the standard used to evaluate Rule 12(c) motions, *see infra* at p. 7.

Products"). *Id.* at ¶ 22. Vista was to retain all rights to the Combined Products, but would grant DNA a sublicense in the products and underlying technology. *Id.* at ¶ 23. The Licensing Agreement required both DNA and Vista to market, advertise, and sell the Combined Products. *Id.* at ¶ 24. Vista did not pay DNA any cash consideration for the DNA technology. *Id.* Rather, DNA was to receive a portion of the consideration paid by third parties for each Combined Product. *Id.* Thus, the consideration DNA received for the DNA Technology was Vista's promise to produce, advertise, market, and sell the Combined Products, and to share proceeds from those sales with DNA. *Id.*

Initially, the Combined Products were being developed according to plan. *Id.* at ¶ 29. But, Vista then failed to complete a final product prototype. *Id.* at ¶ 31. Vista informed DNA that Curtiss-Wright would not authorize additional funding for the Combined Products unless DNA obtained firm orders. *Id.* at ¶ 32. As per industry practice, however, DNA would not be able to solicit orders successfully without a working prototype. *Id.* at ¶ 33. Further, Vista informed DNA that even if the Combined Products were completed, Vista would not market or sell them. *Id.* at ¶ 35. In brief, Curtiss-Wright had decided to "kill" the Combined Products so as to protect its investments in a direct competitor of DNA, leaving DNA to liquidate and disappear. *Id.* at ¶ 36.

Shortly after Vista and DNA entered into the Agreements, Curtiss-Wright bought all of the stock of DY4, Inc. ("DY4"). *Id.* at ¶ 37. DY4 was a direct competitor with DNA in the market for non-ruggedized DSP products. *Id.* at ¶ 38. After acquiring DY4, Curtiss-Wright created Curtiss-Wright Controls Embedded Computing ("CWCEC"), an unincorporated entity, and gave it responsibility for controlling and managing Vista. *Id.* at ¶ 40. Curtiss-Wright placed top managers of DY4 in the leadership of CWCEC, thus allowing Vista to be controlled by DNA's competitor. *Id.*

Curtiss-Wright realized that Vista's performance under the Agreements would jeopardize Curtiss-Wright and DY4 because (i) the Combined Products competed directly with DY4; (ii) Curtiss-Wright would be required to share profits on the sale of Combined Products with DNA, whereas it would retain the whole profit from sales of products by DY4; (iii) Vista's performance under the Agreements would provide profits to DNA and would thus prop up a competitor of DY4; and (iv) DNA would use its profits to develop its next generation of products. *Id*. at ¶ 43. Further, Curtiss-Wright knew that if Vista's failure to perform under the Agreements became obvious to DNA, DNA would terminate the Agreements, sue Vista, and take the DNA Technology to a new partner. *Id*. at ¶ 45.

To prevent these adverse results, Curtiss-Wright decided that (i) Vista would not actively market the Combined Products, *id*. at ¶ 46; (ii) Curtiss-Wright would cause DNA to think that Vista was continuing to develop the Combined Products when in fact Vista was not doing so, *id*.; and (iii) Curtiss-Wright would wait for DNA to declare bankruptcy and then turn over the DNA Technology to DY4, *id*. at ¶ 48. When these measures did not work quickly enough, Curtiss-Wright suspended Vista's performance under the Agreements until DNA secured purchase orders for the Combined Products. *Id*. at ¶ 49. This extra-contractual requirement put DNA in a difficult position – *i.e.*, it was unable to solicit purchase orders without a prototype, but no prototype was forthcoming from Vista. *Id*. at ¶ 50. Curtiss-Wright's plan was successful and DNA declared bankruptcy on August 3, 2005.[4]

## II.    Procedural Background

---

[4]Post-petition, DNA sold substantially all of its assets to GE Fanuc Embedded Systems, Inc. ("GEF"). DNA, Teraforce, Vista, and GEF entered into an agreed order pursuant to which the Court ordered rejection of each of the Agreements without prejudice to DNA's claims and causes of action against the Defendants. Amended Complaint at ¶ 52. Thereafter, Vista filed a proof of claim against DNA in the Underlying Case, asserting an unsecured claim for $3,400,000. *Id.* at ¶ 53.

As noted previously, Teraforce and DNA filed separate petitions for Chapter 11 relief on August 3, 2005.[5] The Court ordered joint administration of the cases on August 5, 2005. Docket No. 34 in the Underlying Case. The Plaintiff instituted this adversary proceeding on March 10, 2006 by the filing of the Original Complaint. A plan of reorganization for the Debtors was confirmed by the Court on April 6, 2006. Docket No. 330 in the Underlying Case. Pursuant to the terms of that plan, the proceeds realized from the prosecution of this adversary proceeding, if any, will, after payment of expenses and attorneys fees, be divided among O.S. Wyatt, Jr. (85%), the Debtor (10%), and holders of Class 5 allowed subordinated claims (5%). Debtors' and Bean Group's Fourth Amended Joint Consolidated Chapter 11 Plan of Reorganization, Docket No. 267 in the Underlying Case, at ¶ 7.12.3.

The Original Complaint contained seven separate counts. Specifically, the Plaintiff (i) objected to Vista's claim in Count 1, (ii) sought equitable subordination of Vista's claim in Count 2, (iii) sought a declaratory judgment of anticipatory repudiation of the Agreements by Vista in Count 3, (iv) sought to recover damages for Vista's breach of the Support Agreement – *i.e.*, for Vista's failure to pay DNA $100,000 to train Vista employees – in Count 4; (v) sought to recover damages for Vista's breach of the Agreements by failing to produce, advertise, market, and sell the Combined Products in Count 5; (vi) sought to recover damages for Vista's breach of an implied duty of good faith and fair dealing by failing to use its best efforts to produce, advertise, market, and sell the Combined Products in Count 6; and (vii) sought to recover damages for Curtiss-Wright's tortious interference with the Vista Agreements in Count 7. Original Complaint at ¶¶ 41-78. In the Amended

---

[5]The Underlying Case and Case No. 05-38757, respectively.

Complaint, the Plaintiff added an eighth count – erroneously labeled as a second Count 7 – seeking to recover damages for Curtiss-Wright's violations of the North Carolina Unfair and Deceptive Trade Practices Act (the "UDTPA"). Amended Complaint at ¶¶ 93-97.

In the Motion, the Defendants seek a judgment on the pleadings regarding only the Count 7 claim against Curtiss-Wright – *i.e.*, the tortious interference claim.

## III. Legal Analysis and Authority

### A. Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c)[6] provides that "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." F.R.C.P. 12(c). The standard for dismissal under Rule 12(c) is the same as the standard for dismissal for failure to state a claim under Rule 12(b)(6). *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004) (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002)). A court accepts the well-pleaded facts in the complaint as true and views those facts in the light most favorable to the plaintiff. *Id.* The motion "should not be granted unless the plaintiff would not be entitled to relief under any set of facts that he could prove consistent with the complaint." *Id.*

### B. North Carolina Tortious Interference Claims

In North Carolina,[7] the elements of a tortious interference with contract claim are: (1) a valid contract between the plaintiff and a third person that confers upon the plaintiff a contractual right

---

[6]Rule 12(c) applies here by virtue of Federal Rule of Bankruptcy Procedure 7012(b).

[7]The parties agree that North Carolina law is controlling. Memorandum at p. 5; Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Judgment on the Pleadings (the "Reply" or the "Defendants' Reply") at p. 4. Therefore, the Court will evaluate the tortious interference claim under North Carolina law.

against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to the plaintiff. *Embree Const. Group, Inc. v. Rafcor, Inc.*, 411 S.E.2d 916, 924 (N.C. 1992) (citing *United Laboratories, Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (1988); *Peoples Security Life Ins. Co. v. Hooks*, 367 S.E.2d 647, 649-50 (1988); *Wilson v. McClenny*, 136 S.E.2d at 577-78; *Childress v. Abeles*, 84 S.E.2d 176, 181-82 (1954), *reh'g dismissed*, 86 S.E.2d 916 (1955)).

## 1.    A "Non-Outsider" Can be Liable for Tortious Interference

The Defendants first argue that the Plaintiff cannot prevail on a claim for tortious interference because Curtiss-Wright is not an "outsider" to the contract. Memorandum at p. 5. In support of this argument, the Defendants rely upon several tortious interference cases that use the word "outsider" instead of "defendant" when discussing the second, third, fourth, and fifth elements of a tortious interference claim – *i.e.*, "(2) that the *outsider* had knowledge of the plaintiff's contract with the third person; (3) that the *outsider* intentionally induced the third person not to perform his contract with the plaintiff; (4) that in so doing the *outsider* acted without justification; and (5) that the *outsider*'s act caused the plaintiff actual damages." Memorandum at p. 5 (citing *Peoples*, 367 S.E.2d at 650–51) (emphasis added) (internal citations omitted). The Defendants also point to *Allied Distributors, Inc. v. Latrobe Brewing Co.*, 847 F.Supp. 376 (E.D.N.C. 1993), in which the court rejected a tortious interference claim because the defendant was a "non-outsider." *Id.* at 379 (citing *Smith v. Ford Motor Co.*, 221 S.E.2d 282, 292 (1976) (defining "outsider" as "one who is not a party to the contract in question and who had no legitimate business interest of his own in the subject matter thereof," and

defining "non-outsider" as "one who, though not a party to the terminated contract, had a legitimate business interest of his own in the subject matter.").

If the Defendants are correct, this Court should reject the Plaintiff's tortious interference claim because the Plaintiff alleged facts showing that Curtiss-Wright had a legitimate business interest in the Vista Agreements and was therefore not an "outsider" to the Agreements. However, North Carolina tortious interference law is more nuanced than the Defendants suggest. While the North Carolina Supreme Court did, for a number of years, use the word "outsider" when articulating the elements of a tortious interference claim (arguably suggesting that only "outsiders" could be held liable for tortious interference as the Defendants suggest), an analysis of those cases demonstrates the fallacy in the Defendants' overly simplistic approach.

For example, in *Peoples*, the case that the Defendants cite to establish the elements of a tortious interference claim, Memorandum at p. 5, the defendant was a former employee who had gone to work for a competitor and subsequently induced several of the plaintiff's employees to do the same. 367 S.E.2d at 648. The plaintiff's complaint alleged that the defendant offered the plaintiff's employees job opportunities that induced them to terminate their terminable-at-will contracts and, by locating these employees in their previously assigned territories, induced them to breach the noncompetition clauses contained in their contracts with the plaintiff. *Id*. At 650. While the court concluded that the complaint failed to state a claim for tortious interference (because the court recognized the general principle that interference may be justified when the plaintiff and the defendant are competitors and thus, the fourth element of a tortious interference claim was not satisfied), *id*. at 650-51, as relevant here, the defendant was an "outsider" to the contract, so no issue of non-outsider liability for tortious interference arose.

In *Wilson v. McClenny*, 136 S.E.2d 569 (N.C. 1964), the Supreme Court of North Carolina again used the word "outsider" instead of defendant when stating the elements of a tortious interference claim. *Id*. at 577–78. Because the defendants were all shareholders and/or directors with financial interests or fiduciary relationships to the corporation whose contract was allegedly interfered with – *i.e.*, "defendants here are not outsiders," the *Wilson* court determined that they had a qualified privilege to interfere with their corporation's contract, but only because they had acted in good faith to protect the interests of the corporation. *Id.* Significantly, however, the court recognized the possibility of individual, "non-outsider" liability "where [the officer's] acts involve individual and separate torts distinguishable from acts solely on his employer's behalf or where his acts are performed in his own interest and adverse to that of his firm." *Id*. at 578.

In *Smith v. Ford Motor Co.*, 221 S.E.2d 282 (N.C. 1976), the court avoided using the word "outsider" when repeating the elements of a tortious interference claim as alleged by the plaintiff; instead using the defendant's name without referring to its status as a "non-outsider" or an "outsider." *Id*. at 289–90. The defendant's status was an issue in the case, however. After defining a "non-outsider" as "one who, though not a party to the terminated contract, had a legitimate business interest of his own in the subject matter," *id.* at 292, the court classified the defendant as a "non-outsider." *Id*. Of significance here, however, the *Smith* court rejected an interpretation of *Wilson* that would provide absolute immunity from tortious interference liability for "non-outsiders." *Id*. at 292–93.[8] Rather, the court held that the plaintiff had stated a valid cause of action because he

---

[8]Specifically, the court stated:

> To hold, as was done in *Wilson* . . . , that a non-outsider has a Qualified [sic] right to bring about the termination of another's terminable contract of employment when, in good faith, he believes this to be necessary to protect his own legitimate business interest or to perform his own fiduciary duty to the employer, is a far different thing from holding that a non-outsider

alleged that the defendant had acted with malice – *i.e.*, for a reason other than the legitimate business interest that provided the defendant with its "non-outsider" status to begin with. *Id.* at 292 ("We perceive no reason for conferring upon the non-outsider immunity to suit for the malicious procurement of the termination of a contract when such action has no relation whatever to the source of the non-outsider status.").[9]

Finally, in *Embree Construction Group, Inc. v. Rafcor, Inc.*, 411 S.E.2d 916 (N.C. 1992), the North Carolina Supreme Court stated the elements of a tortious interference claim using the word "defendant" in place of "outsider."[10] The court upheld – in the Rule 12(b)(6) context – a claim that the defendant directors and officers of the contracting corporation tortiously interfered with the corporation's contract when they acted in their own self-interest to the detriment of the corporation. *Id.* at 925–26. "Generally speaking, interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an *outsider*, are competitors. In the context of interference with contract by an *insider*, however, the element that the defendant acted withfout justification is *potentially* vitiated by the defendant's corporate position." *Id.* at 924 (emphasis added) (citations omitted).

---

is Ipso [sic] facto immune to suit for damages for bringing about the termination of such contract in all cases.

*Id.*

[9]The Defendants also rely upon *Allied Distributors v. Latrobe Brewing Co.*, 847 F.Supp. 376 (E.D.N.C. 1993), to support their claim that a "non-outsider" cannot be held liable for tortious interference with contract as a matter of law. Memorandum at pp. 5–6. That is indeed the holding of *Allied Distributors*. 847 F.Supp. at 379 ("Labtrobe, as a non-outsider, has no tort liability under North Carolina law for tortious interference with the agreement allegedly entered into between HRT and Allied."). However, this Court respectfully disagrees with the *Allied Distributors* court.

[10]*See supra* at pp. 7-8; *see also United Laboratories, Inc. v. Kuykendall*, 370 S.E.2d 375, 387 (N.C. 1988) (stating the elements of tortious interference using the word 'defendant' in place of 'outsider').

The Plaintiffs have alleged – and the Defendants do not dispute – that Curtiss-Wright is Vista's sole shareholder. *Amended Complaint* at ¶ 11. As a shareholder, Curtiss-Wright had a legitimate business interest in the Vista Agreements and is therefore a "non-outsider" to the Vista Agreements. The Defendants argue that this "non-outsider" status provides Curtiss-Wright with an absolute immunity from tortious interference liability. But, as demonstrated above, the North Carolina Supreme Court has developed and affirmed the legal premise that, under certain circumstances, a "non-outsider" to a contract can be held liable in tort for interference with that contract. Therefore, this Court cannot hold that Curtiss-Wright is immune from liability based solely on its "non-outsider" status.

### 2. A Shareholder Can Incur Liability for Tortious Interference with its Corporation's Contracts

Confronted with *Embree*, the Defendants admit that non-liability of "non-outsiders" for tortious interference is a "general rule," to which there is an exception. Reply at p. 5. The Defendants argue that this exception is limited to officers and directors and therefore does not apply to Curtiss-Wright, a shareholder. *Id.* The Defendants point out that the defendants in *Embree* were corporate officers and directors. Therefore, according to the Defendants, the *Embree* holding is limited and only officers and directors enjoy a qualified, rather than absolute, privilege to interfere with their corporation's contracts. *Id.* (citing *Embree*, 411 S.E.2d at 924–25).

The Court must reject this argument because the *Embree* court itself makes clear that its reasoning extends beyond officers and directors when it stated that "[o]fficers, directors, *shareholders, and other corporate fiduciaries* have a qualified privilege to interfere with contractual relations between the corporation and a third party." *Embree*, 411 S.E.2d at 924 (emphasis added)

(internal quotations omitted).[11] Although the North Carolina Supreme Court has not yet applied its reasoning in *Embree* in the corporate-shareholder context, the United States Court of Appeals for the Fourth Circuit has. Applying North Carolina law, the Fourth Circuit decided that a corporate parent of a contracting corporation had a qualified privilege to interfere with that corporation's contracts. *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 351 (4th Cir. 1998) (quoting *Embree*, 411 S.E.2d at 924). The Fourth Circuit held that the corporate-parent defendant was privileged to interfere with its subsidiary's contracts because it had acted in good faith to maximize its subsidiary's profits. *Id.* But, the Fourth Circuit clarified that the parent's privilege was qualified, not absolute, and would not apply where the parent acted in its own interest and adverse to that of its subsidiary. *Id.* (quoting *Wilson*, 136 S.E.2d at 578).

Because the North Carolina Supreme Court has not definitively ruled on the issue of whether a shareholder's privilege to interfere with its corporation's contracts is absolute or qualified, it falls to this Court to predict how the North Carolina Supreme Court would rule. *See Matheny v. Glen Falls Ins. Co.*, 152 F.3d 348, 353–54 (5th Cir. 1998); *Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992). Given the North Carolina Supreme Court's dictum in *Embree,* and mindful of the persuasive precedent of the Fourth Circuit's decision in *Broussard*, this Court concludes that the North Carolina Supreme Court would extend its

---

[11]In support of their proposed limitation of the privilege to interfere to corporate officers and directors, the Defendants offer the rationale that "the risk of self-dealing does not present itself in the case of parent corporations." Reply at p. 5 (citing *Tex. Taco Cabana, L.P. v. Taco Cabana of N.M., Inc.*, 304 F.Supp.2d 903, 912 (W.D. Tex. 2003). While it may be generally true that the interests of a corporate parent align with those of its subsidiary, the Court need not look far for a contrary example as the facts alleged by the Plaintiff here present just such a situation. With this said, the Court understands the need for a parent corporation to make decisions that are in the best interests of the conglomerate as a whole, even though the decision may hurt the particular subsidiary that is the contracting party. But, the Court simply disagrees with the Defendants' premise that this rationale justifies an absolute privilege (or immunity) from tortious interference liability for corporate parents.

reasoning in *Embree* to a corporate shareholder, and would grant the shareholder a qualified, rather than an absolute, privilege to interfere with its corporation's contracts.

Accordingly, this Court also rejects the Defendants' argument that under North Carolina law the qualified privilege to interfere with a corporation's contracts belongs only to officers and directors of that corporation and that other "non-outsiders" enjoy an absolute privilege. Rather, this Court concludes that, under North Carolina law, a shareholder is legally capable of interfering with its corporation's contracts.

>3.     **The Fourth Element of a Tortious Interference Claim is Met when the Defendant Acts with an Improper Motive or Uses Improper Means to Interfere with the Contract**

The Defendants next argue that the Plaintiff has not successfully pled the fourth element of a tortious interference claim. Memorandum at pp. 7–8. As previously discussed, the fourth element of a tortious interference claim is that the defendant acted without justification. *See supra* at p. 8. North Carolina cases tend to conflate this element with the defendant's qualified privilege to interfere with the contract in question. Thus, if a defendant is privileged to interfere, it is justified in doing so and the fourth element is not met. Conversely, if the plaintiff alleges facts that would negate the defendant's privilege, the complaint will withstand a Rule 12(c) motion. *See Embree* at 924–25.

Having decided that only a qualified privilege to interfere with its subsidiaries' contracts applies to corporate parents, this Court must now decide what the limits of that privilege are and whether the Plaintiff has alleged facts that, if proven, would negate Curtiss-Wright's qualified privilege. If the Defendants are correct in asserting that the Plaintiff has failed to allege such facts, the Amended Complaint must be dismissed.

In both their Memorandum and Reply, the Defendants focus exclusively on Curtiss-Wright's motive for interfering. Memorandum at pp. 7–11; Reply at pp. 6–10. Implicit in the Defendants' arguments is the legal premise that the existence of a proper motive is the only requirement needed to qualify for the privilege. Memorandum at p. 11 ("Curtiss-Wright cannot as a matter of law be liable for tortious interference because its alleged conduct . . . was motivated at least in part by economic considerations.").

The Court disagrees with this premise as well. For the reasons explained more fully below, the Court concludes that under North Carolina law, a "non-outsider" is privileged to interfere with a contract when the "non-outsider" (1) acts with the proper motive *and* (2) uses proper means. We now address both requirements.

### a. Proper Motive

The Defendants argue that the fourth element of a tortious interference claim is not satisfied here because the Plaintiff fails to plead facts showing that Curtiss-Wright's actions were motivated exclusively by malice. Memorandum at p. 8. However, as stated above, the requirement of proper motive must be analyzed as one of two prongs necessary before a non-outsider's interference can be justified under North Carolina law.

### (1) Legitimate Business Purpose as the Sole Motive

It is clear under North Carolina law that the motive prong of the fourth element of a tortious interference claim is not met when the defendant's sole motivation for interfering is a legitimate business purpose. *Peoples* at 221 ("If . . . the defendant is acting for a legitimate business purpose, his actions are privileged."); *Embree* at 924. Where the defendant is an outsider, competition is a legitimate business purpose. *Id.* On the other hand, insiders such as officers, directors, and

stockholders act with a legitimate business purpose when they are acting in the best interests of the corporation. *Wilson*, 136 S.E.2d at 578; *Embree* at 924. Corporate fiduciaries enjoy a rebuttable presumption that their actions are in the best interests of the corporation. *Wilson*, 136 S.E.2d at 578; *Embree* at 924.

### (2)    Malice or Corporate Insider Self-Interest as the Sole Motive

It is also clear under North Carolina law that the motive prong of the fourth element of a tortious interference claim is met when the defendant is motivated by malice alone. *Peoples* at 221 ("If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified."); *Smith*, 221 S.E.2d at 296 (N.C. 1976) (explaining that the plaintiff had stated a cause of action where he had alleged that the defendant acted out of ill will and not pursuant to any legitimate business interest). In *Childress v. Abeles*, 84 S.E.2d 176, 182 (N.C. 1954), the North Carolina Supreme Court explained that "actual malice may negative the existence of justification in a particular case. This is true because the [third party] is never justified in inducing a breach of contract solely for the purpose of visiting his personal hatred, ill will, or spite upon the plaintiff."

In the corporate context, as stated previously, officers, directors, and shareholders are privileged to interfere on behalf of the corporation, and are presumed to have done so. *Embree* at 924. However, because the privilege is a qualified one, it is overcome where the fiduciary's motives are improper. *Id*. An officer's motive is improper when he acts in his own interest and adverse to the interest of his firm. *Id*. at 925.

### (3)    Mixed Motives

The more difficult question arises where the interferor is motivated by both a legitimate

business interest and ill-will toward the plaintiff. The Defendants strenuously argue that the complaint must admit of no motive for interference other than malice. Memorandum at p. 8. In support of this argument, the Defendants cite a number of North Carolina Court of Appeals cases. *Id*. (citing *Privette v. Univ. of North Carolina*, 385 S.E.2d 185 (N.C. Ct. App. 1989); *Wagoner v. Elkin City Schools' Bd. of Educ.*, 440 S.E.2d 119 (N.C. Ct. App. 1994); *Filmar Racing, Inc. v. Stewart*, 541 S.E.2d 733 (N.C. Ct. App. 2001); *Beck v. City of Durham*, 573 S.E.2d 183 (N.C. Ct. App. 2002)). In contrast, the Plaintiff argues that it is possible for an interferor to act without justification even if one of its motives is a legitimate business interest. Reply at pp. 31–32 (citing *United Laboratories, Inc. v. Kuykendall*, 370 S.E.2d 375 (1988)).

Fortunately, this Court need not decide whether an interferor with mixed motives is justified under North Carolina law because the Plaintiff has alleged no facts showing that Curtiss-Wright acted for any motive other than to increase its bottom line, which is a legitimate business interest. According to the Plaintiff, Curtiss-Wright preferred to operate through DY4 – which would allow Curtiss-Wright to keep all of the profits – rather than continue with the Vista Agreements and share profits with the Plaintiff. Amended Complaint at ¶ 43. The Plaintiff further alleges that Curtiss-Wright mislead the Plaintiff as to Curtiss-Wright's intentions because Curtiss-Wright did not want the Plaintiff to take the DNA Technology elsewhere and compete with DY4. *Id*. at ¶ 45. However, the Plaintiff does not allege any facts showing that Curtiss-Wright acted out of ill-will or malice or a specific desire to harm the Plaintiff.

Because a legitimate business interest is a proper motive for interference with contract under North Carolina law, and because the Plaintiff states no facts in the Amended Complaint suggesting any other motive, the Plaintiff has not plead facts supporting a claim that Curtiss-Wright acted with

**Memorandum Opinion and Order** **Page 17**

an improper motive. However, our legal analysis does not end here. As explained more fully below, an interferor is justified under North Carolina law only when the interferor acts with the proper motive *and* by proper means. This test is conjunctive. Or, stated another way, the acts will not be privileged if the interferor acts with improper motives or uses improper means. Thus, if the Plaintiff has alleged facts to show that Curtiss-Wright acted by improper means, it will have stated a claim for tortious interference.

### b. Proper Means

In connection with the Defendants' discussion of the scope of the qualified privilege, the Defendants cite two North Carolina Supreme Court cases – *i.e.*, *Peoples* and *Embree*. Memorandum at pp. 7, 11; Reply at p. 6. However, both of these cases state that a defendant that uses improper means is not privileged to interfere with a contract. In discussing the qualified privilege where the litigants are business competitors, the *Peoples* court stated that "interference in another's business relations . . . is not actionable so long as it is carried on in furtherance of one's own interest *and by means that are lawful*." 367 S.E.2d at 650 (emphasis added) (citations omitted). Similarly, the *Embree* court, discussing the qualified privilege of insider officers, stated that the "privilege . . . is . . . overcome when the *means* or the officer's motives are improper." 411 S.E.2d at 924 (citing *Wilson*, 136 S.E.2d at 578). Significantly, both *Peoples* and *Embree* quote the Restatement (Second) of Torts § 767 (the "Restatement"), which lists seven factors to use in determining whether interference is improper. *Peoples*, 367 S.E.2d at 650; *Embree*, 411 S.E.2d at 924. The first factor is "the nature of the actor's conduct," Restatement § 767(a) – *i.e.*, "the means by which the actor . . . cause[d] the harm." Restatement § 767 cmt. c. This comment further explains that "[t]he issue is

not simply whether the actor is justified in causing the harm, but rather whether the actor is justified in causing it in the manner in which the actor does cause it." *Id*.

Lest any doubt remain that proper means is a requirement for shareholders, we quote the *Wilson* court, which stated that "[a]s stockholders, [defendants] had a financial interest in the corporation . . . As . . . stockholders, they were privileged purposely to cause the corporation not to renew plaintiff's contract . . . *if, in securing this action, they did not employ any improper means*." 136 S.E.2d at 578 (emphasis added) (citation omitted); *Broussard*, 155 F.3d at 352 (finding no liability for a shareholder defendant because the shareholder did not engage in self-dealing).

### (1) Means and the "No Motive Other Than Malice" Standard

Although the Defendants did not respond directly to the Plaintiff's argument that a "non-outsider's" qualified right to interfere is lost when the interferor employs improper means, Opposition at pp. 8-10, the Defendants restated their position that a tortious interference claim should be dismissed unless the complaint "admit[s] of no motive for interference other than malice." Reply at pp. 6-7 (quoting *Pinewood Homes, Inc. v. Harris*, 646 S.E.2d 826, 832-33 (N.C. Ct. App. 2007)). From this statement, the Court infers an argument that motive should be the sole criterion to which a court should look when evaluating whether a defendant acted without justification. This argument finds support in a number of North Carolina Court of Appeals cases. *See Privette v. Univ. of North Carolina*, 385 S.E.2d 185 (N.C. Ct. App. 1989); *Wagoner v. Elkin City Schools' Bd. of Educ.*, 440 S.E.2d 119 (N.C. Ct. App. 1994); *Filmar Racing, Inc. v. Stewart*, 541 S.E.2d 733 (N.C. Ct. App. 2001); *Beck v. City of Durham*, 573 S.E.2d 183 (N.C. Ct. App. 2002) (collectively, the "Court of Appeals Cases"). In each of the Court of Appeals Cases, the court upheld dismissal of a tortious interference claim because the plaintiff had alleged facts showing some motive other than

or in addition to malice. *Id.* In none of these cases did the court engage in a separate analysis of the means used to interfere. *Id*.

The Plaintiff claims that the Court of Appeals Cases are not binding on this Court because they are decisions from intermediate state courts of appeal.[12] Opposition at ¶ 29 (citing *Matheny v. Glen Falls Ins. Co.*, 152 F.3d 348, 354 (5th Cir. 1998)). Rather, according to the Plaintiff, in determining a question of state law, "federal courts must look to decisions of the highest state court." *Id*. (quoting *St. Paul & Marine Ins. Co. v. Convalescent Servs. Inc.*, 193 F.3d 340, 342 (5th Cir. 1999) (internal quotations omitted). The Defendants disagree with the Plaintiff, Reply at p. 7, but the authorities they cite are not necessarily in conflict with the Plaintiff's proposed standard. For example, the Defendants quote the Fifth Circuit Court of Appeals, stating that "a decision by an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (Defendants' emphasis removed). Because this Court is "convinced . . . that the highest court of the state would decide" contrary to the *Privette, Wagoner, Filmar*, and *Beck* courts, the Court declines to follow those courts with regard to the requirement of proper means.

The North Carolina Supreme Court has not encountered a set of allegations showing proper motive but improper means, and thus has not held as a basis for decision that a means analysis is necessary when evaluating qualified privilege. In the absence of such a holding, this Court would

---

[12]The litigants discuss this issue – of how much weight a federal court should give to intermediate state court decisions – in the context of their disagreement over the "no motive other than malice" standard itself. Opposition at ¶ 29; Reply at pp. 7-8. The Court concludes that it applies equally to the argument the Court infers from the Defendants' Reply – *i.e.*, that this standard eliminates the need for a means analysis once a court has identified a non-malicious motive.

normally be inclined to give weight to the rulings of intermediate state courts that are on point.  But, the Court is convinced that, given the opportunity, the North Carolina Supreme Court would hold that allegations of improper means alone can satisfy the "without justification" requirement of the fourth element of a tortious interference claim.  The primary basis for this conclusion is the North Carolina Supreme Court's repeated statements, although in the nature of dicta, indicating that an interferor that uses improper means is not privileged to interfere.  *See supra* at pp. 18-19.  In fact *Peoples* – the only North Carolina Supreme Court case to which the Defendants cite for the "no motive other than malice" rule – states emphatically that the qualified privilege to interfere is available only when both proper motive and proper means are present.  367 S.E.2d at 650, 651.

Moreover, the Court is concerned that the no-means-analysis rule implicit in the Court of Appeals Cases does not have a solid basis in the cases on which those courts rely.  The Court of Appeals Cases cite to *Sides v. Duke University*, 328 S.E.2d 818, 829 (N.C. Ct. App. 1985), for their "no motive other than malice" standard.  *Privette*, 385 S.E.2d at 190; *Wagoner*, 440 S.E.2d at 125; *Filmar*, 541 S.E.2d at 738.[13]  In *Sides*, the North Carolina Court of Appeals looked to *Smith*, 221 S.E.2d 282 (N.C. 1976), to answer the question of whether a plaintiff must allege but-for causation in order to state a claim for tortious interference.  328 S.E.2d at 829.  The *Sides* court answered that question in the negative, then stated its own interpretation: that *Smith* requires that a tortious interference complaint "admit[] of no other motive . . . than malice."[14]  *Id*.  The *Privette*, *Wagoner*,

---

[13]The remaining Court of Appeals Case cites indirectly to *Sides* through *Filmar*.  *Beck*, 573 S.E.2d at 191 (citing *Filmar*, 541 S.E.2d at 738).

[14]As stated above, *see supra at* pp. 16-18, this Court need not decide whether this rule is correct in the context of a motive analysis because the only motive Plaintiff alleges that Curtiss-Wright acted on is a legitimate business interest.

*Filmar*, and *Beck* courts then interpreted this as applying not only to the question of proper motive, but also to the question of proper means.

The Court respectfully disagrees with this interpretation of North Carolina Supreme Court jurisprudence. The *Smith* court never reached the question of improper means because it found that the plaintiff had alleged no motive other than malice. 221 S.E.2d at 296. Because allegations showing either improper motive *or* improper means are sufficient to satisfy the fourth element of a tortious interference claim, the *Smith* court did not need to engage in a means analysis. *Smith* therefore does not support an implicit rule that a means analysis is unnecessary where a motive other than malice is alleged.

For the above-stated reasons, the Court concludes that given the opportunity, the North Carolina Supreme Court would rule that the fourth element of a tortious interference claim is properly plead where a plaintiff alleges facts showing that an interferor-defendant acted with a proper motive but used improper means.

### (2) What Means Are Improper

Having determined that, under North Carolina law, improper means will overcome a defense of privilege to interfere, the Court must now explore what means are improper. As noted above, the *Peoples* court required that the interferor use lawful means. *See supra* at p. 18. Thus, interference with a contract through illegal acts constitutes improper means under North Carolina law.[15]

The Plaintiff alleges that Curtiss-Wright violated the North Carolina Unfair and Deceptive

---

[15]The *Peoples* court also proscribed "methods [that] are . . . of a class of which fraud, misrepresentation, intimidation, coercion, obstruction, or molestation of the rival or his servants . . . are instances" 367 S.E.2d at 651 (citations omitted). Because the Court concludes that Curtiss-Wright's alleged acts could be found to violate North Carolina law, *see infra* at pp. 22-24, the Court does not need to go further and decide whether non-illegal acts that fall into the categories listed by the *Peoples* court would suffice here as well.

Trade Practices Act (the "UDTPA"). *Id.* ¶¶ 93–97. The UDTPA makes unlawful "unfair or deceptive acts or practices in or affecting commerce." N.C. GEN. STAT. ANN. § 75-1.1(a) (1977). North Carolina courts have interpreted this statute broadly. *See* Robert G. Byrd, *Misrepresentation in North Carolina*, 70 N.C. L. REV. 323, 361–66 (1992). In order make a prima facie case for violation of the UDTPA, a plaintiff must show that (1) the defendant committed an unfair or deceptive act or practice; (2) the act was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. *White v. Consolidated Planning, Inc.*, 603 S.E.2d 147, 161 (2004), *review denied*, 610 S.E.2d 717, 717 (N.C. 2005) (citing *Pleasant Valley Promenade v. Lechmere, Inc.*, 464 S.E.2d 47, 58 (1995)).

As stated above, the first element in an unfair practice claim is that the defendant committed an unfair or deceptive act or practice. The test is disjunctive – *i.e.*, the act may be either unfair or deceptive, but need not be both. *South Atlantic Ltd. Partnership of Tennessee, L.P. v. Riese*, 284 F.3d 518, 534 (4th Cir. 2002) (applying North Carolina law). A practice is unfair when it is offensive to public policy, or when it is "immoral, unethical, oppressive, [or] unscrupulous." *Johnson v. Phoenix Mut. Life Ins. Co.*, 266 S.E.2d 610, 621 (N.C. 1980) (overruled on other grounds). An act is deceptive if it has the capacity or tendency to deceive. *Id.* at 622. The Court concludes that the means the Plaintiff alleges that Curtiss-Wright used to interfere could be found to be both unfair and deceptive.

The Plaintiff alleges that Curtiss-Wright was not forthright with the Plaintiff about Curtiss-Wright's intention that Vista would not perform under the Agreements. Amended Complaint at ¶¶ 46-47, 49. The Plaintiff further alleges that Curtiss-Wright acted in this way because, had the Plaintiff known the truth, the Plaintiff would have terminated the Agreements, taken the DNA Technology

to a new partner, and sued Vista. *Id*. at ¶ 45. Hiding one's true intentions so as to take advantage of another could be unethical and therefore "unfair." Curtiss-Wright's alleged actions could be found to have the tendency to deceive and could therefore be found "deceptive."

The second element of an unfair practice claim is that the act was in or affecting commerce. *See supra* at p. 22. "'[C]ommerce' includes all business activities, however denominated." N.C. GEN. STAT. ANN. § 75-1.1(b) (1977). The Plaintiff alleges that Curtiss-Wright, Vista, and the Plaintiff were all corporations engaged in business. Amended Complaint at ¶ 10-12. The Agreements were business contracts between Vista and the Plaintiff. *Id*. at ¶ 21. Curtiss-Wright allegedly interfered with the Agreements in order to increase its own profitability. *Id*. at ¶ 43. Because these activities were all business-related, the second element of an unfair practice claim could also be found to be satisfied.

The third element of an unfair practice claim is that the act proximately caused injury to the plaintiff. *See supra* at p. 22. Here, the Plaintiff alleges that Curtiss-Wright mislead the Plaintiff as to Vista's performance under the Agreements, *Id*. at ¶ 47; that based on this misinformation the Plaintiff continued with the Vista Agreements rather than breaking with Vista and taking the DNA Technology elsewhere, *Id*. at ¶ 45; and that as a result, the Plaintiff lost revenues and was eventually forced to declare bankruptcy. *Id*. at ¶ 51. Because the Plaintiff has alleged facts that could show that Curtiss-Wright's actions harmed the Plaintiff, the third element of an unfair practice claim could also be found to be satisfied.

The Plaintiff has alleged facts to support each element of an unfair practice claim under North Carolina law. Accordingly, the Plaintiff has alleged facts that could be found to constitute illegal activity, which could satisfy the improper means requirement.

## IV.    Conclusion

Under North Carolina law, a "non-outsider" defendant is legally capable of tortiously interfering with a contract.  In order to state a valid claim of tortious interference, a plaintiff must allege facts showing, *inter alia*, the fourth element of a tortious interference claim – *i.e*., that the defendant acted without justification. To meet this requirement, a plaintiff must allege facts showing that the defendant interfered either (1) with an improper motive, or (2) by using improper means.

Here, with regard to improper motive, the Plaintiff failed to allege facts showing that Curtiss-Wright acted for any motive other than a legitimate business interest.  The Plaintiff therefore did not allege facts showing improper motive.

A plaintiff shows improper means, however, if it alleges facts showing that the defendant interfered with the contract through means that are illegal.  Here, the Plaintiff has alleged facts that, if proven, could subject Curtiss-Wright to liability for violations of the North Carolina Unfair and Deceptive Trade Practices Act.  Having alleged facts sufficient to show improper means, the Plaintiff has met its burden to allege that Curtiss-Wright acted without justification.  Accordingly, the Motion must be denied.

It is therefore **ORDERED** that the Motion is denied.

### ### End of Memorandum Opinion and Order ###
